UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INDEPENDENT TOWER AND WIRELESS INC. , and
NORTHEAST BROADCASTING COMPANY INC.
  d/b/a Boston Independent Radio, Inc.

v.

PREFERRED TANK AND TOWER INC.;
PREFERRED TANK AND TOWER MAINTENANCE DIVISION, INC.; and
HERMAN JOHNSTON

COMPLAINT

I. Introduction

1.  This action arises from a bungled contract to repair a 500 foot commercial radio antenna tower in Florida.  The repairs were necessary to restore the structural integrity of the tower.  However, the work that was done was substandard and makeshift.  The tower remains structurally compromised, unsafe and worse off than it was before.

2.  But this case is not simply about poor workmanship.  In order to cover their tracks, defendants Johnston and Preferred Tank And Tower, Inc. misrepresented the facts and attempted to pass their work off as safe and structurally sound when they knew that it was not.

II.  Parties

3.  Plaintiff, Independent Tower and Wireless Inc. (hereinafter "**Independent Tower**") is a Delaware corporation with a principal place of business at 228 South River Road, Bedford, New Hampshire 03110.

4.  Plaintiff, Northeast Broadcasting Company Inc d/b/a Boston Independent Radio ("**Northeast**") is a Massachusetts corporation with a principal place of business at 30 How Street, Haverhill, Massachusetts 01837.

5. Defendant, Preferred Tank and Tower Inc. (hereinafter "**Preferred**") is a Delaware corporation with a principal place of business at 515 Pennel Street, Henderson, Kentucky 42420 and a mailing address of 5444 East Indiana Street, PMB 374, Evansville, Indiana 47715.

6. Defendant, Preferred Tower Maintenance Division (hereinafter "**Preferred Maintenance Division**") is a Delaware corporation with a principal place of business at 515 Pennel Street, Henderson, Kentucky 42420 and a mailing address of 5444 East Indiana Street, PMB 374, Evansville, Indiana 47715.

7. Defendant Herman Johnston is, on information and belief, a citizen and resident of Kentucky or Indiana.  His work address (the only address known to plaintiffs) is c/o Preferred Tank And Tower, Inc. 515 Pennel Street, Henderson, Kentucky 42420.  His work mailing address is 5444 East Indiana Street, PMB 374 Evansville, Indiana 47715.

III.  Jurisdiction And Venue

8. This court has subject matter jurisdiction pursuant to:

   (a) 28 U.S.C. § 1332 (diversity jurisdiction) because there is complete diversity of citizenship between all of the plaintiffs and all of the defendants and the amount in controversy exceeds $75,000; and

9. Venue lies in this court pursuant to (a) 28 U.S.C. § 1391(a)(2) because a substantial portion of the events giving rise to the claim occurred in this district.

IV.  Facts

10. Preferred:  Defendant Preferred Tank & Tower Inc. describes itself as "American's premier full service tank and tower company."  See, www.preferredtankandtower.com.  It claims to operate no fewer over thirty crews "throughout the continental United States and abroad."  Id. (at www.preferredtankandtower.com/?page_id=2 ).  Preferred's crews have done work in at least

three locations in the District of Massachusetts since 2008.  It solicits business from throughtout the United States, including this judicial district, through an interactive website which includes both a vendor application and a form and invitation for prospective customers to contact the company via email.

11.  As explained below, defendant Herman Johnston was Preferred's president, vice-president and principal at all times relevant to this action.  The Preferred website invites prospective customers from throughout the United States to email Johnson directly.  Through Preferred, Johnston did business in this judicial district and elsewhere.

12.  As explained below, defendant Preferred Maintenance is, on information and belief, a successor transferee of assets and opportunities belonging to Preferred.

13.  <u>The Contract</u>:  On or about July 1, 2010, plaintiffs retained Preferred to inspect a 500 foot guyed commercial radio antenna tower in Rockledge, Florida ("**the tower**").  Plaintiff Independent Tower owns the tower and the underlying real estate.  The tower is used by plaintiff Northeast which owns and operates a commercial radio station in the area.

14.  Preferred's inspection revealed that the Tower was in need of **emergency** structural repairs.  More specifically, the metal "anchors"  on which the guy wires are mounted needed to be replaced along with the concrete "anchor pads" into which the anchors are sunk.  The anchor pads are large slabs of reinforced concrete, poured deep into the ground.  The anchor pads need to placed at specific locations and the metal anchors need to be set into the concrete at specific angles in order for the guying system to work properly.

15.   Without getting too technical:   (a) the existing anchor heads were twisted; (b) the anchor rods that were sunk into the concrete were rusted; (c) the turnbuckles needed to be

replaced; (d) the base legs needed to be moved; and (e) the concrete was wearing down.  All of this together threatened the structural integrity of the tower.

16.  After receiving a detailed inspection report from Preferred, plaintiffs asked Preferred to quote the cost of these and other necessary repairs.

17.  On August 18, 2010 Preferred provided plaintiffs with a quote in the form of a proposed contract.  More specifically Preferred offered to complete all of the following repairs for $62,725:

> (a) It would install six new anchors, complete with new guy wire and new guy wire hardwire, and then check the tension one year after installation;
>
> (b) Because the concrete footings for the anchors needed to be sunk into a wetland, the area around the footings would be temporarily dewatered to allow the concrete to harden (and as a practical matter this would require the use of caissons);
>
> (c) Preferred would clean and paint the entire entre tower and feed lines in accordance with FAA daymarking standards; and
>
> (d)  Preferred would install an OSHA approved safety ladder on the tower.

18.  On or about August 20, 2010, plaintiffs accepted Preferred's proposal.  They signed the contract form that Preferred had provided.

19.  Pursuant to the terms of the parties' contract, plaintiffs were obligated to pay the $62,725 contract price as follows:  20% at the time the contract was signed; 40% upon mobilization, and 40% upon completion of the work.

20.  Per the contract, plaintiffs paid (a)  $12,000 (20% of the contract price) at the time they entered into the contract and (b) $25,090 shortly thereafter.

21. <u>The Bid Was Low Balled</u>:  As noted above, the anchor pads had to be installed in a wetland.  Therefore the area needed to be temporarily dewatered and, as a practical matter, this could only be done through the use of caissons.   On information and belief, the $62,725 contract price quoted by Preferred did not account for the use of caissons, since, in fact no caissons were actually used.  Thus, it was a "low ball" bid designed to generate a quick contract even though it would be difficult or impossible to complete the work and make a profit at the quoted price.

22.  Nonetheless, once plaintiffs accepted the contract, Preferred had an obligation to perform the necessary dewatering, presumably by caissons,.

23. <u>The Work</u>:  Thereafter, Preferred began to work on the project.  However, as verified in large part by an independent expert, Preferred's work was outrageously substandard:

    (a) The concrete anchor pads were set at the wrong angle, such that the guy wires would be incapable of keeping the tower erect;

    (b) The concrete had not, and could not cure because Preferred failed to temporarily dewater the site for the footings, so the anchor pads themselves were unsound and incapable of keeping tower erect;

    (c)  Preferred used the wrong type of concrete and deliberately chose not use the more expensive type necessary for a wetlands installation, thereby compounding the problems caused by the lack of dewatering;

    (c) The concrete anchor pads were not poured into three foot diameter, 20-30 foot deep drilled holes, lined with rebar and caissons, and, therefore, were incapable of permanently supporting the tower; and

    (d)  The guy wire that Preferred planned to use was smaller in diameter, and cheaper, than that required to ensure the structural integrity of the tower.

24. Thus, Preferred failed at both the design and execution stage.  It designed a guy system that could not work.  Then it failed to build even that substandard system, instead leaving unusable pads of uncured concrete set into the wetland.

25. The design errors were, in the first instance, the fault of Preferred's Project Manager, who personally designed the system.  On information and belief, the Project Manager used a design for a 300 foot tower that he found in antenna catalog.  The tower in this case is 500 feet tall and, as one of the Project Manager's colleagues has said, using the improper design resulted in the improper placement of the anchor pads.

26. The design errors were also necessarily the result of Preferred's failure to properly train and supervise its Project Manager.

27. The construction errors were the fault of Preferred's highest ranking executives because they did nothing to require the use of caissons or other effective dewatering methods.

28. Additional construction errors were committed by the Project Manager and construction subcontractor who were personally responsible to ensure (a) proper dewatering; (b) the use of proper concrete and guy wire; and (c) the proper installation of the anchor pads.  The construction subcontractor utterly failed in this regard and the Project Manager utterly failed to oversee and supervise the project.   In turn, Preferred failed to supervise and train the Project Manager.

29. All of these errors came to a head, when another subcontractor, hired to install the guy wires, refused to proceed with the work.  The guy wire installer essentially blew the whistle by saying that the project could not be completed as planned because the anchor pads were misaligned and the guy wire was too small.

30. Instead of acting to remedy these structural deficiencies, on information and belief, the Project Manager and Preferred terminated the guy wire installer in retaliation for his blowing the whistle and refusing to participate in a structurally unsound and unsafe project.

31. <u>The Cover Up</u>:  By this time, plaintiffs were growing concerned about the project. They confronted the Project Manager who claimed that he personally reviewed photographs of the anchor pads and they appeared acceptable to him.  Plaintiffs then spoke by phone directly with Preferred's President, defendant Herman Johnston.  Johnston told plaintiffs that (a) the design was fine;  (b) the footings were fine; and (c) all that was needed to make the guying system right were "screw shackles" that would serve as "self-straighteners," thereby remedying any design defect.  **During this phone conversation, Johnson said that the work was "totally acceptable."**

32. **According to somebody who was in the room with Johnston at the time of this phone call, Johnston *lied*.  On information and belief, as soon as Johnston hung up the phone he contradicted what he had just represented to plaintiffs.  Johnston said that the anchor pads were *not* acceptable.  Johnston said that Preferred should not have paid its construction subcontractor for the work, because it did not meet the minimum standard called for in the contract.**

33. According to the same individual, who was physically present in the room during the phone call, Johnston decided that Preferred would do everything in its effort to pass the substandard work off as acceptable and nothing to cure its manifest, material breach.  Johnston was determined that Preferred would keep plaintiffs' money without making any of the truly necessary repairs.

7

34. Johnston and Preferred had a series of communications with plaintiffs, by phone and otherwise during which they repeated like a mantra their false claims that (a) the anchor pads were acceptable, (b) the work was done properly, and (c) with the installation of "screw shackles" the guying system would be perfect.

35. Johnston then delegated the task of dealing with plaintiffs to a subordinate who believed that the concrete anchor pads needed to be replaced by new pads and constructed in caissons using the correct concrete blend. This subordinate was looking around for companies that could do the work when he was terminated by Johnston. Johnston did nothing to follow up on the subordinate's efforts.

29. Because guying system was never properly repaired, the tower is structurally unsound. Therefore, it cannot be safely painted and the OSHA compliant ladder cannot be installed.

30. Additionally, Preferred's substandard work has caused damage to property beyond the damage to its own work: The concrete that Preferred poured into the ground needs to be removed and the land remediated. Further, additional site work will be required prior to new repairs due to the improper placement of the anchor pads. Finally, due to the delay caused by Preferred, the structural integrity of the tower itself has deteriorated to the point that additional repairs may be more costly.

30. Plaintiffs estimate that the cost of doing the necessary site work and making adequate repairs to the tower is well above $100,000 exclusive of the cost or removing the anchor pads installed by Preferred and remediating the land.

36. <u>Possible Transfer Of Assets</u>:  A former Preferred employee has indicated, and therefore it is alleged on information and belief, that defendant Johnston is in the process of

transferring the assets of Preferred to an affiliated corporation, defendant Preferred Tank And Tower Maintenance Division.  This former employee has stated, and it is therefore alleged on information and belief, that Preferred's customers now make their payments to the affiliated company rather than Preferred.  Thus, the affiliated company's assets increase while Preferred's assets decrease.

37.  On further information and belief, Preferred has transferred corporate opportunities, corporate goodwill and other intangible assets to Preferred Tank And Tower Maintenance Division in an effort to (a) decrease Preferred's assets, (b) increase Preferred Maintenance Division's assets; and (c) put those assets beyond the reach of Preferred's creditors.   For example, Preferred Maintenance Division does not appear to have a website or any other marketing presence.  Indeed, from a prospective customer's perspective, the two entities would appear to be a single unit.

38.  On information and belief, these transfers of financial and intangible assets are fraudulent conveyances that, unless judicially reversed, would put Preferred's assets out of the reach of its creditors, including plaintiffs.

CAUSES OF ACTION

COUNT I—BREACH OF CONTRACT
(Defendant Preferred)

39.  The Plaintiffs re-allege and incorporate the factual allegations set forth in Paragraphs 1-41, above.

40.  Plaintiffs entered into a binding contract with defendant Preferred Tank And Tower, Inc.  Plaintiff performed all of its material obligations under that contract.  Preferred Tank And Tower, Inc., breached the contract by failing to make any of the tower repairs required under the

contract. The work Preferred did was unacceptable, unsound and plainly in breach of it written and implied warranties.

41. As a result of Preferred's breach, plaintiff has been damaged by (a) the funds they paid to Preferred ($37,090); (b) the cost of having the work done properly; and (c) the cost of removing Preferred's work and remediating the site.

WHEREFORE, plaintiffs request (a) compensatory damages and (b) costs and interest.

COUNT II-NEGLIGENCE
(Defendant Preferred)

42. The Plaintiffs re-allege the factual allegations in Paragraphs 1-44 above.

43. <u>Negligent Design</u>: Preferred Tank and Tower, Inc. had a duty of reasonable care in the design of the guying system. Defendant breached this duty of care by failing to design a system for a 500 foot radio tower. Instead defendant used a design for a 300 foot tower that was entirely inadequate and unsafe. As a direct and proximate result of this breach, defendant has caused extensive damage to the plaintiff.

44. <u>Negligent Supervision</u>: Preferred Tank and Tower, Inc. duty of reasonable care to supervise the activities of (a) its employees including the Project Manager and (b) its construction subcontractor. Defendant breached this duty of care by looking the other way when *among other things* (a) the project was improperly designed; (b) the wrong size wire was chosen; (c) the wrong method for dewatering was chosen; (d) the wrong concrete mix was used; (d) the anchor pads were not poured as required., (e) the anchor pads were placed in the wrong location; and (f) the anchors were placed at the wrong angles.

45. <u>Negligent Hiring</u>: Additionally, this defendant had a duty to employ reasonable hiring practices to ensure that its agents and employees were qualified and competent. Nevertheless and in disregard of this responsibility defendant negligent hired a Project Manager

and retained a construction subcontractor who committed all of the errors described in paragraphs 46 and 47.

46. As a direct and proximate cause of these negligent breaches, plaintiffs have suffered substantial economic damages.

WHEREFORE, the Plaintiffs request (a) compensatory damages and (b) costs and interest.

## COUNT IIII
(Florida Deceptive Trade Practices Act)
(Defendants Johnston And Preferred)

47. The Plaintiffs re-allege and incorporate the factual allegations set forth in in Paragraphs 1-49 above.

48. Defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat.§ 501.204(1) and (b). The conduct describe above constitutes unfair and deceptive trade practices.

WHEREFORE, plaintiffs request (a) compensatory damages; (b) attorneys' fees; and (c) costs and interests pursuant to Fla.Stat. § 501.2105

## COUNT IV
(Massachusetts Consumer Protection Act)
(Defendants Johnston And Preferred)

49. The Plaintiffs re-allege and incorporate the factual allegations set forth in in Paragraphs 1-51 above.

50. Defendants have violated the Massachusetts Consumer Protection Act, M.G.L.A. ch. §93A §§2 and 11.  The conduct described above constitutes unfair and deceptive trade practices.

WHEREFORE, plaintiffs request (a) compensatory damages; (b) treble damages or in the alternative double damages; (c) attorneys; fees; and (d) costs and interests pursuant to statute.

## COUNT V
## FRAUDULENT TRANSFER
(Defendant Preferred Tank & Tower Maintenance Division)

51. Plaintiffs re-allege and incorporate all of the factual allegations set forth in Paragraph 1-53 above.

52. As noted above, Preferred and Preferred Maintenance are Delaware corporations with their principal place of business in Kentucky. As alleged above, on information and belief, Preferred has been transferring its assets to Preferred Maintenance. On further information and belief, these transfers have not been made in return for arms-length consideration but were rather part of a plan to put Preferred's assets beyond the reach of its creditors.

53. To the extent that Kentucky law may control this issue, the transfer of assets to Preferred Maintenance was, on information and belief, made in violation of Kentucky Revised Statutes Chapter 378. Therefore, to the extent that plaintiffs obtain a judgment on any of the other counts in this Complaint, they should be permitted to reach the assets of Preferred Maintenance to collect on that judgment.

54. To the extent that Florida, Indiana, Delaware or Massachusetts law applies, all of those jurisdictions have enacted the Uniform Fraudulent Transfer Act ("UFTA"). On information and belief the transfer of Preferred's assets to Preferred Maintenance violated the UFTA in all of its codifications. Therefore, to the extent that plaintiffs obtain a judgment on any of the other counts in this Complaint, they should be permitted to reach the assets of Preferred Maintenace to collect on that judgment.

**A JURY TRIAL IS DEMANDED ON
ALL CLAIMS TRIABLE TO A JURY**

WHEREFORE plaintiffs request:

1. A jury trial on all claims triable to a jury;

2. Judgment in the plaintiffs' favor on all counts;

3. Compensatory damages;

4. Treble damages on the Massachusetts Consumer Protection Act claims, against the defendants named in those counts;

5. Attorneys' fees;

6. Costs and Interests;

7. An order allowing plaintiffs to collect the judgment, fees, costs and interest from defendant Preferred Tank And Tower Maintenance Division, Inc. to the extent that it has been the recipient of fraudulently transferred assets that belonged to either of the other two defendants; and

8. Such further relief as the court deems just and proper.

                                          Respectfully submitted,

                                          Independent Tower And Wireless, Inc.; and
                                          Northeast Broadcasting, Inc.

                                          By Their Attorneys,

February 20, 2012                      /s/ Andrew R. Schulman          ,
                                          Andrew R. Schulman, Esq.
                                          Getman, Schulthess & Steere, P.A.
                                          1838 Elm Street
                                          Manchester, NH 03104
                                          (603) 634-4300
                                          (603) 626-3647 (facsimile)
                                          aschulman@GSS-lawyers.com
                                          NH Bar 2276
                                          Mass BBO 549769